AO 91 (Rev. 11/82)  **CRIMINAL COMPLAINT**                                         **ORIGINAL**

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA<br>v.<br>SAM LOCK SIU | DOCKET NO. |
|---|---|
| | MAGISTRATE'S CASE NO.<br>MJ18-0420 |

Complaint for violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(C)

| NAME OF MAGISTRATE JUDGE<br>THE HONORABLE JACQUELINE CHOOLJIAN | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
|---|---|---|

| DATE OF OFFENSE<br>December 1, 2017 | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

[21 U.S.C. §§ 841(a)(1), (b)(1)(C)]

On or about December 1, 2017, in Los Angeles County, within the Central District of California, defendant SAM LOCK SIU knowingly possessed with intent to distribute and distributed methamphetamine, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(C) (Possessing with Intent to Distribute and Distribution of Methamphetamine).

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>John E. Hackman |
|---|---|
| | OFFICIAL TITLE<br>Task Force Officer – ATF |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE[(1)] | DATE<br>February 26, 2018 |
|---|---|

[(1)] See Federal Rules of Criminal Procedure 3 and 54

AUSA Veronica Dragalin x0647     REC: Detention

## <u>AFFIDAVIT</u>

I, John E. Hackman, being duly sworn, declare and state as follows:

### I. <u>PURPOSE OF AFFIDAVIT</u>

1.   This affidavit is made in support of a criminal complaint and arrest warrant for SAM LOCK SIU ("SIU") for a violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(C) (Possession with Intent to Distribute and Distribution of Methamphetamine).

2.   This affidavit is also made in support of a search warrant for SIU's residence located at 2447 Riverdale Avenue, Los Angeles, California 90031 (the "SUBJECT PREMISES"), as described in Attachment A-1, and a search warrant for SIU's car, a Cadillac, CTS Model, bearing California license plate 7VQH432 (the "SUBJECT CAR"), as described in Attachment A-2, for fruits, instrumentalities, and evidence of violations of Title 21, United States Code, Section 846 (Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances); Title 21, United States Code, Sections 841(a)(1), (b)(1)(C) (Distribution and Possession with Intent to Distribute Controlled Substances); Title 21, United States Code, Section 856 (Maintaining a Premise for the Purpose of Distributing Controlled Substances); Title 18, United States Code, Section 922(g)(1) (Felon in Possession of a Firearm and Ammunition), Title 18, United States Code, Section 924(c) (Possession of a Firearm in Furtherance of a Drug Trafficking Crime) (collectively, the "Subject Offenses"), the items to be seized

and further described in Attachment B.  Attachments A-1, A-2,
and B are incorporated herein by reference.

3.    The facts set forth in this affidavit are based on my
personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested complaint and
warrants and does not purport to set forth all of my knowledge
of or investigation into this matter.  Unless specifically
indicated otherwise, all conversations and statements described
in this affidavit are related in substance and in part only.

## II. BACKGROUND FOR TASK FORCE OFFICER JOHN E. HACKMAN

4.    I am a Task Force Officer ("TFO") with the United
States Bureau of Alcohol, Tobacco, Firearms and Explosives
("ATF").  I am also a Police Officer for the City of Los
Angeles, and I have been so employed for approximately 11 years.
I am currently assigned to the Metropolitan Division Crime
Impact Team and am tasked with investigating serial crimes,
violent crimes, and crimes involving weapons.  I was previously
assigned as a Gang Enforcement Officer at the Southwest Division
and the Devonshire Division.  I have received training in, and I
have conducted, investigations of offenses involving drug
trafficking and the illegal possession and use of firearms.
Through my training and experience, I am familiar with the ways
in which people who are prohibited from possessing firearms
acquire, possess, and conceal firearms and ammunition, and the
ways in which drug traffickers use firearms to safeguard their

2

products and facilitate their trafficking.  I am familiar with the ways in which drug traffickers and those prohibited from possessing firearms use coded language and digital devices to commit and conceal their crimes.

### III.  SUMMARY OF PROBABLE CAUSE

5.   On November 27, 2017, defendant SIU, a convicted felon, sold one firearm with eleven rounds of ammunition to a confidential informant ("CI") near SIU's residence, the SUBJECT PREMISES.  On December 1, 2017, SIU sold four ounces of methamphetamine to the same CI less than one mile from the SUBJECT PREMISES.  On December 13, 2017, SIU sold a semi-automatic rifle to the same CI less than one mile from the SUBJECT PREMISES.  In all three transactions, agents saw SIU arrive at the transactions in the SUBJECT CAR.  The November 27, 2017 firearm sale took place inside the SUBJECT CAR.

### IV.   STATEMENT OF PROBABLE CAUSE

**A.    LAPD Arrest of SIU in the SUBJECT CAR and Subsequent Search of SUBJECT PREMISES**

6.   Based on my review of an LAPD report and conversations with other law enforcement officers, I am aware of the following:

7.   On or about September 16, 2017, LAPD officers from the Metropolitan Division conducted a traffic stop of a car with California license plate 7VQH432 (the SUBJECT CAR), after observing two traffic violations.  Defendant SIU was the driver and sole occupant of the car.  Upon approaching SIU, the officers saw in plain view a small plastic baggie containing an

3

off-white, powdery substance resembling cocaine in the center console, cup-holder area of the car. Officers searched the SUBJECT CAR and found, among other things, 100 small plastic baggies, a digital scale, and five large plastic bags containing a green, leafy substance resembling marijuana.

8. During the course of the traffic stop and subsequent investigation, SIU signed a "Consent to Search Form" to allow officers to search his residence, specifically, his bedroom at 2447 Riverdale Avenue, Los Angeles, California 90031 (the SUBJECT PREMISES). The same day, on September 16, 2017, LAPD officers searched SIU's bedroom at the SUBJECT PREMISES and found, among other things, a loaded blue-steel, Para 1911, model Expert Commander, .45 caliber, semi-automatic pistol, loaded with a magazine with seven rounds of live .45 caliber ammunition, and a box of 20 rounds of .40 caliber ammunition.

9. LAPD officers placed SIU under arrest for a violation of California Penal Code Section 29800(a)(1), Ex-Convict with a Gun. SIU was subsequently released on bond.

10. From my conversations with other law enforcement officers, I am aware that LAPD officers obtained a state warrant to place a tracker on SIU's car, the SUBJECT CAR.

**B.  November 27, 2017 Firearms Transaction**

11. Based on my training and experience, investigation in this case, personal observations as part of the surveillance team, review of law enforcement reports, review of audio and video recordings, and conversations with other law enforcement

agents and a confidential informant working for the ATF (the "CI"),[1] I am aware of the following:

12.  On or about October 11, 2017, LAPD Officer Jose Lopez and I met with the CI.  During the meeting, the CI advised that he/she knew of a source of firearms and drugs he/she knew as "Locke."  The CI described "Locke" as an Asian man who had been recently arrested after a search of his residence by LAPD Metropolitan Division officers.  Through a search of law enforcement records of recent post-search arrests by the Metropolitan Division, I tentatively identified "Locke" as defendant SAM LOCK SIU.  I showed the CI a DMV photo of SIU. The CI positively identified the photo of SIU as the same individual he/she knew as "Locke."

13.  On or about November 21, 2017, at the direction of law enforcement agents, the CI made contact via text messages and phone calls with SIU, asking if SIU had a firearm available to sell.  SIU replied that he had a handgun for sale for between $650 and $700.

14.  On November 27, 2017, at approximately 7:15 p.m., agents met with the CI at a predetermined staging location and equipped the CI with a video and audio recording device.  Before the operation, TFO Jason Malik and I searched the CI and his/her car for drugs and other contraband, and found no contraband.  In

---

[1] The CI has received monetary compensation for his/her involvement in this investigation.  The CI has one felony conviction for battery.

the presence of TFO Malik, I provided the CI $700 to complete
the transaction.

15.   The CI told me that SIU told him/her that he was not
going to be at the agreed meeting location due to heavy police
presence.  SIU told the CI that he would meet the CI by his
residence at 2447 Riverdale Avenue (the SUBJECT PREMISES).[2]  Once
we learned this information, various agents set up surveillance
in the area of the SUBJECT PREMISES.[3]

16.   At approximately 7:50 p.m., the CI departed the
staging location in his/her car.  I followed the CI's car to
maintain surveillance during the transaction.  The CI parked
his/her car near the intersection of Riverdale Avenue and Blake
Avenue, approximately two blocks from the SUBJECT PREMISES.

17.   Based on my personal observations and observations of
other law enforcement officers, I am aware that SIU's car, a
Cadillac, CTS with California license plate 7VQH432 (the SUBJECT
CAR)[4] drove past the CI.  SIU then turned around and pulled up
next to the CI's car and told the CI to enter his car.  The CI
entered the SUBJECT CAR, and SIU drove to Blake Avenue and

_____

[2] According to law enforcement records, SIU's residence is
2447 ~~2774~~ Riverdale Avenue, Los Angeles, California 90031 (the
SUBJECT PREMISES).  DMV records show that SIU listed the SUBJECT
PREMISES as his residence.

[3] The SUBJECT PREMISES is located at the end of a dead-end
street, which makes it difficult and dangerous for agents to set
up surveillance with a direct view of the SUBJECT PREMISES.  In
addition to visual surveillance, agents relied on GPS
information from the SUBJECT CAR, obtained pursuant to the state
search warrant.

[4] The SUBJECT CAR is registered to SIU, at 2447 Riverdale
Avenue, Los Angeles, CA 90031 (the SUBJECT PREMISES).

6

Shoredale Avenue, approximately two blocks away, to complete the
transaction.  According to the CI, SIU pulled a cloth bag
containing a firearm from under the steering column of SIU's
car.  SIU gave the gun to the CI and grabbed the slide area to
verify that it was a handgun.  According to the CI, he/she gave
SIU $660, and SIU then gave the CI $4 in change back for a total
price of $656 for the firearm.  SIU then drove the CI back to
her/his car at Riverdale Avenue and Blake Avenue.  The CI
entered his/her car and left the location.  I followed the CI's
car to a predetermined meet location.

18.   Immediately following the transaction, the CI met with
law enforcement officers at the predetermined location, and
turned over the gun he/she purchased from SIU.  Officers
determined that the firearm was a Smith & Wesson, model SW40VE,
handgun, bearing serial number RBJ8604.  The handgun had a .40
caliber magazine with eleven rounds of assorted .40 caliber
ammunition.  I then turned off the video and audio recording
device.  The CI then returned $44 in cash in the presence of TFO
Malik.

**C.   December 1, 2017 Drug Transaction**

19.   Based on my review of investigative reports and
conversations with other agents and the CI, I know that on or
about November 30, 2017, the CI made contact with SIU via text
messages and phone calls, and asked SIU if he had a firearm
available to sell.  SIU replied that he had a fully automatic
AK-47 for sale for $1,800 and six ounces of methamphetamine for

sale for $1,000.  SIU arranged for the transaction to occur on
December 1, 2017.

20.  On December 1, 2017, at approximately 5:30 p.m., I met
with the CI at a predetermined staging location and equipped the
CI with a video and audio recording device.  Before starting the
operation, ATF Special Agent Travis Gibb and I searched the CI
and his/her car for drugs and other contraband, and found no
drugs or contraband.  In the presence of Special Agent Gibb, I
provided the CI $2,800 to complete the transaction.

21.  At approximately 6:45 p.m., the CI departed the
staging location and drove to the area of Blake Avenue and
Duvall Street, approximately nine blocks from the SUBJECT
PREMISES.  Several agents had set up surveillance near Blake
Avenue and Duvall Street.  According to the CI, SIU called the
CI and advised him/her that he had to stop at his residence to
pick up the drugs prior to the transaction.

22.  During this operation, agents monitored the SUBJECT
CAR remotely based on the tracker affixed to the SUBJECT CAR
pursuant to the state warrant.  According to GPS data from the
tracker, the SUBJECT CAR was not in the area of the SUBJECT
PREMISES before the transaction.  At approximately 7:00 p.m.,
the SUBJECT CAR arrived at the SUBJECT PREMISES.  At
approximately 7:20 p.m., the SUBJECT CAR left the SUBJECT
PREMISES and was tracked to the area of the transaction.

23.  Agents conducting surveillance saw the SUBJECT CAR
drive onto Duvall Street and park, and saw a male matching SIU's
description exit the SUBJECT CAR and approach the CI's car.

Agents then saw SIU enter the passenger side of the CI's car.
According to the CI, SIU gave the CI a clear plastic baggie
containing a substance that looked like methamphetamine, along
with two smaller grey plastic baggies containing a substance
that looked like methamphetamine.  SIU told the CI that it was
four ounces.  SIU requested $800.00 for the methamphetamine,
which the CI provided.  SIU said that he was unable to produce
the AK-47 firearm he had discussed with the CI, but he stated
that he would contact the CI when it became available.  SIU then
exited the CI's car and entered the SUBJECT CAR.  The CI then
departed the location.  I followed the CI back to a
predetermined meet location.

24.   After arriving at the predetermined debrief location,
the CI turned over to me a clear plastic baggie along with two
grey plastic baggies of suspected methamphetamine.  I then
turned off the video and audio recording device.  The CI then
returned $2,000 in the presence of LAPD Officer Ruben Rodriguez.

**D.   December 13, 2017 Firearms Transaction**

25.   On or about December 12, 2017, at approximately 8:30
p.m., the CI was contacted by SIU by phone.  SIU contacted the
CI regarding a firearm that they discussed at the previous
transaction.  SIU agreed to meet the CI the next day, on
December 13, 2017, at approximately 6:00 p.m.

26.   On December 13, 2017, at approximately 7:15 p.m., ATF
Special Agent Mark Davis and I met with the CI at a
predetermined staging location and equipped the CI with a video
and audio recording device.  Before starting the operation, we

9

searched the CI and his/her car for contraband, and did not find any.

27.  Several agents set up surveillance in the area of 2447 Riverdale Avenue (the SUBJECT PREMISES).

28.  At approximately 7:30 p.m., the CI departed the staging location in his/her car, followed by Special Agent Davis and me.  The CI parked his/her car near the intersection of Blake Avenue and Duvall Street, two blocks from the SUBJECT PREMISES.  Agents conducting surveillance saw the SUBJECT CAR drive past the CI to the end of the block.  SIU then turned around and parked his car outside of 2245 Duvall Street, Los Angeles, California, and exited his car.  SIU then approached the CI's car and entered the passenger side of the CI's car. SIU and the CI then drove to a local gas station at Figueroa Street and Avenue 26.  According to the CI, during that drive, SIU contacted an unknown person via cellular phone and directed the unidentified person to park his car at 2245 Duvall Street, where SIU's car was parked.

29.  A short time later, agents conducting surveillance saw a black Dodge Charger, bearing Oregon license plate 510FZL, park by 2245 Duvall Street.  The CI and SIU returned and parked across from this location.  Both SIU and the CI exited the CI's car and entered the garage area of 2245 Duvall Street.

30.  Based on my review of the recording as well as conversations with the CI, I know the following: SIU introduced the CI to a Hispanic man, who stated that he goes by the moniker "Smokey" and also by "Danny," and lives at 2245 Duvall Street.

10

SIU stated that "Smokey" brought the firearm to the garage.
"Smokey" opened a case containing a firearm and showed the CI.
SIU and the CI discussed the price of the firearm, and the CI
agreed to purchase the firearm for $1,900.  SIU then provided
the CI a black trash bag to cover the case containing the
firearm and walked the CI towards his/her car.  The CI entered
his/her car and drove to a predetermined meet location.  Special
Agent Davis and I followed the CI back to the predetermined
location.

　　　31.  After arriving that the predetermined debrief
location, the CI advised me that the firearm was in his/her
backseat.  I recovered a black gun case containing one Sig Sauer
5.56X45 caliber rifle bearing serial number 20A002063, one 30-
round 5.56X45 magazine, one 10-round 5.56X45 magazine, and one
Sig Sauer sighting optic.  Special Agent Davis turned off the
video and audio recording device.

### E.   Additional Discussions Between the CI and SIU Regarding Firearms and Drugs

　　　32.  On or about January 27, 2018, SIU contacted the CI and
stated that he was trying to sell a fully automatic rifle for
$2,000.  The CI reported this contact to me the same day.

　　　33.  At my direction, the CI contacted SIU on January 29,
2018, to purchase the firearm.  SIU advised the CI that the
price of the firearm had increased to $2,300, because it was a
sought-after firearm and there was a "bidding war."  SIU and the
CI agreed on the price.  The CI asked SIU to bring four ounces
of methamphetamine for the agreed upon price of $800.00.  SIU

and the CI agreed that the transaction would occur on the following day, January 30, 2018.

34.  On January 30, 2018, at approximately 8:30 p.m., SIU and the CI agreed to conduct the firearm and drug transaction in the area of Blake Avenue and Duvall Street.  The CI made telephonic contact with SIU, who stated that he could not sell the firearm, but that the drugs were available for purchase. Approximately 45 minutes later, SIU made telephonic contact with the CI and stated he could not obtain the requested drugs.  The CI returned to the briefing location, and returned the $800.

35.  On January 31, 2018, SIU contacted the CI and stated that he had secured the firearm from the previous day and that it was still available for sale for $2,300.  The CI advised SIU that he would meet with him on February 2, 2018, at approximately 7:00 p.m.

36.  On February 1, 2018, the CI confirmed that the transaction would take place on February 2, 2018, at approximately 7:00 p.m.  The CI asked if SIU had any drugs available to purchase.  SIU stated that he had four to eight ounces of methamphetamine available for sale.

37.  On February 2, 2018, SIU contacted the CI and advised him/her that the person providing the firearm was not returning his phone calls.  SIU still offered to sell the CI the four ounces of methamphetamine.  A short time later, SIU contacted the CI and advised him/her that he was unable to provide the requested drugs.

12

**F.    SIU's Criminal History**

38.   On December 30, 2017, I reviewed SIU's criminal history using the California Law Enforcement Telecommunications System ("CLETS") and National Crime Information Center ("NCIC") databases.  Based on my review of this information, I learned that SIU has previously been convicted of the following felony crimes, each punishable by a term of imprisonment exceeding one year:

a.   On or about January 12, 2007, SIU was convicted of Discharge of Firearm in Public, in violation of California Penal Code Section 246.3, in the Superior Court of the State of California, County of Los Angeles, in case number GA06874301.

b.   On or about December 2, 2008, SIU was convicted of Possession of a Controlled Substance, in violation of California Health and Safety Code Section 11377, in the Superior Court of the State of California, County of Los Angeles, in case number BA34250001.

c.   On or about January 29, 2010, SIU was convicted of Accessory to Murder, in violation of California Penal Code Section 32, in the Superior Court of the State of California, County of Los Angeles, in case number GA0794103.

d.   On or about January 22, 2014, SIU was convicted of Bringing Contraband in Jail and Possession of a Controlled Substance, in violation of California Penal Code, Section 4573.5 and Health and Safety Code Section 11377(a), in the Superior Court of the State of California, County of Los Angeles, in case number GA09213501.

**G.    Interstate Nexus**

39.   On February 20, 2018, Bureau of Alcohol, Tobacco, and Firearms, and Explosives ("ATF") Special Agent Alex Liwienski, an Interstate Nexus Expert, examined photographs of the firearm SIU sold to the CI on November 27, 2017 and the firearm SIU sold to the CI on December 13, 2017.  SA Liwienski determined that the Sig Sauer 5.56X45 caliber rifle bearing serial number 20A002063, was manufactured outside the State of California.  SA Liwienski determined that the Smith & Wesson, model SW40VE, handgun, bearing serial number RBJ8604, was also manufactured outside the State of California.  Because the firearms were recovered in Los Angeles, California, I believe that the guns traveled in and affected interstate and foreign commerce.

**H.    Field-Test of Suspected Methamphetamine Sold By SIU**

40.   On February 21, 2018, ATF Special Agent Mark Davis field-tested the suspected methamphetamine SIU sold to the CI during the transaction on December 1, 2017.  The substance tested positive for methamphetamine.  Based on my training and experience, the substance also looks and feels like methamphetamine.  The substance was sent to the DEA Southwest Laboratory for lab analysis on February 21, 2018.

**V.     TRAINING AND EXPERIENCE REGARDING THE SUBJECT OFFENSES**

41.   Based on my experience and training as an LAPD Police Officer and an ATF TFO, I am familiar with the methods used in drug-trafficking operations and the trafficking patterns employed by drug organizations.  I have also spoken with agents, as well as other law enforcement officers, about their

14

experiences and the results of their investigations and interviews.  I am knowledgeable in the methods and modes of drug operations and the language patterns of drug trafficking.  I have become familiar with the methods of operation typically used by drug traffickers.  Based on my training, experience, my conversations with other law enforcement officers, and my knowledge of this investigation and others, I am aware of the following:

        a.   Drug traffickers will frequently keep records, documents, and other evidence pertinent to their drug trafficking activities at their residence and areas associated with their residence.  Individuals involved in drug trafficking often conceal evidence of their drug trafficking in their residences, as well as garages, carports, outbuildings, and other surrounding areas to which they have ready access.  In fact, when a drug dealer lives and conducts business at the same place, this is even more likely.  Drug traffickers also conceal evidence in cars, including cars outside of their residences, so that they have ready access to them and so that they can hide them from law enforcement, including law enforcement officers executing search warrants at their residences or businesses.

        b.   Drug traffickers often continue their criminal activity indefinitely.  Drug traffickers begin trafficking in small quantities of drugs.  As they develop their customer base and their supply contacts, they are able to deal in larger quantities of drugs.  Thus, those who are trafficking in large quantities of drugs (i.e., four ounces or more of

methamphetamine) are not new to the business; rather, they have established their contacts and customers over months or years.

        c.    Drug traffickers keep records of their illegal activities for a period of time extending beyond the time during which they actually possess controlled substances, in order to maintain contact with criminal associates for future drug transactions, and to have records of prior transactions for which, for example, they might still be owed drug proceeds, or might owe someone else money.

        d.    Individuals involved in drug trafficking commonly use certain paraphernalia to package and prepare controlled substances for distribution (such as tupperware, cellophane, heat sealers, gylcine or plastic baggies, latex gloves, cutting agents and dilutents, chemical testing devices, triple beam scales and other weighing devices, measuring devices, strainers, compression devices, etc.). Individuals involved in drug trafficking commonly store these items in their residences, garages, outbuildings, storage areas, carports, cars, and in other areas to which the traffickers have ready access. For instance, in this case, SIU stored four ounces of methamphetamine in a plastic bag obtained from the SUBJECT PREMISES.

        e.    Individuals involved in drug trafficking commonly provide drugs to trusted distributors in their organization on credit and commonly obtain drugs from their suppliers on credit. Therefore, I am aware that individuals involved in drug trafficking maintain books, records, customer lists, receipts,

notes, ledgers, and other papers relating to the transportation, receipt, ordering, sales, and distribution of drugs, drug proceeds, and equipment, and that such documents may be in code to thwart law enforcement detection. The aforementioned books, records, receipts, notes, ledgers, correspondence, etc., are commonly maintained where the drug traffickers have ready access to them, such as their residences and cars. This is particularly true when a drug dealer also conducts business from or near his/her residence.

        f.    Individuals involved in drug trafficking sometimes have in their possession -- that is, on their persons, at their residence, at their stash houses, and/or in their cars -- firearms, including handguns, pistols, revolvers, rifles, shotguns, machine guns and/or other weapons, as well as ammunition and ammunition components, that are used to protect and secure the drug traffickers' property. In fact, in this case, SIU sold the CI two guns and stated that he had access to more for sale.

        g.    Individuals involved in drug trafficking generally sell drugs for cash proceeds, as SIU did to the CI in this case. Therefore, drug traffickers typically may have thousands of dollars in cash on hand both as proceeds of sales, to purchase their own supplies, and profits from their drug trafficking activities (such as profits from sales or profits from the transportation of drugs or drug proceeds). In addition, drug traffickers often have other assets generated by their drug business, or purchased with cash earned, such as

precious metals and stones, jewelry, real estate, car, and other valuables.  Drug traffickers often keep these items, and records reflecting their purchase or sale such as automobile titles or deeds to property, as well as evidence of financial transactions relating to obtaining, transferring, secreting, or spending large sums of money acquired from engaging in drug trafficking activities in their residences, offices, garages, storage buildings, automobiles, and safe deposit boxes.

h.   Drug traffickers typically will obtain and distribute controlled substances on a regular basis.  Much as any distributor of a legitimate commodity would purchase stock for sale, such drug traffickers will also have an "inventory" which will fluctuate in size depending on the demand for the product.

i.   Drug traffickers will often conceal controlled substances and drug proceeds in hidden compartments or manufactured spaces, including within the walls of their residences and garages, within furniture contained in their residences, within compartments in their cars, etc.

j.   Drug traffickers often require the use of one or more telephones, pagers, or other digital devices to negotiate times, places, schemes, and manners for importing, possessing, concealing, manufacturing, and distributing controlled substances and for arranging the disposition of proceeds from the sale of controlled substances.  For example, based on my training and experience and investigation in this case, I believe that SIU used a cellular device to communicate with the

CI to negotiate the drugs and firearms deals.  In addition, I
know that professional drug operations depend upon maintaining
timely long-distance and local contacts with the original
suppliers and those down the organizational chain to the local
traffickers.  Telephones and other digital devices enable drug
traffickers to maintain contact with drug associates, drug
suppliers, and drug customers.  I also know that drug
traffickers frequently use pre-paid telephones with misleading
subscriber information as a way of insulating themselves from
criminal liability.

      k.  I am aware that drug traffickers maintain in
their residences or cars telephone and address books, telephone
bills, and other books and papers which reflect, among other
things, the names, addresses, and/or telephone numbers of their
customers, co-conspirators, and associates in the drug
trafficking organization, even if these items are in code.  In
addition, data, records, documents, materials, programs, or
other items contained on cellular telephones used by drug
traffickers often contain, among other things, information
relating to the purchase, sale, transport, or distribution of
drugs, the location of previous drug transactions or stash
houses, and/or the identity or whereabouts of traffickers and
co-conspirators involved in narcotics trafficking.
Communications on digital devices often include telephone calls,
text messages, and e-mail communications between the trafficker
and the co-conspirators, as well as Global Positioning System
("GPS") information, other locational information, and

identifying information about the trafficker and co-conspirators.

l.      Persons who possess, purchase, or sell firearms generally maintain the firearms and records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such as a residence.  Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their cell phones, smart phones, computers, and other digital devices.  It has been my experience that prohibited individuals who purchase firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals.  Many people do not dispose of their firearms-related records; they usually keep their records for long periods, often spanning several years, in a secure location within their residence.

m.      Correspondence between persons buying and selling firearms often occurs by e-mail or text message sent to and from smart phones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience, individuals who engage in street sales of firearms frequently use e-mail and text messages to communicate with each other regarding firearms that the sell or offer for sale.  In addition, it is common for individuals engaging in the unlawful sale of firearms to have

photographs of firearms they or other individuals working with
them possess on their cellular phones and other digital devices
as they frequently send these photos to each other to boast of
their firearms possession and/or to facilitate sales or
transfers of firearms.

        n.    Individuals engaged in the illegal purchase or
sale of firearms and other contraband often use multiple
telephones, particularly ones with removable memory chips, known
as SIM cards.

## VI.      TRAINING AND EXPERIENCE ON DIGITAL DEVICES

    42.  As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart
phones; digital cameras; gaming consoles (including Sony
PlayStations and Microsoft Xboxes); peripheral input/output
devices, such as keyboards, printers, scanners, plotters,
monitors, and drives intended for removable media; related
communications devices, such as modems, routers, cables, and
connections; storage media, such as hard disk drives, floppy
disks, memory cards, optical disks, and magnetic tapes used to
store digital data (excluding analog tapes such as VHS); and
security devices.  Based on my knowledge, training, and
experience, as well as information related to me by agents and
others involved in the forensic examination of digital devices,

I know that data in digital form can be stored on a variety of
digital devices and that during the search of a premises it is
not always possible to search digital devices for digital data
for a number of reasons, including the following:

   a. Searching digital devices can be a highly
technical process that requires specific expertise and
specialized equipment.  There are so many types of digital
devices and software programs in use today that it is impossible
to bring to the search site all of the necessary technical
manuals and specialized equipment necessary to conduct a
thorough search.  In addition, it may be necessary to consult
with specially trained personnel who have specific expertise in
the types of digital devices, operating systems, or software
applications that are being searched.

   b. Digital data is particularly vulnerable to
inadvertent or intentional modification or destruction.
Searching digital devices can require the use of precise,
scientific procedures that are designed to maintain the
integrity of digital data and to recover "hidden," erased,
compressed, encrypted, or password-protected data.  As a result,
a controlled environment, such as a law enforcement laboratory
or similar facility, is essential to conducting a complete and
accurate analysis of data stored on digital devices.

   c. The volume of data stored on many digital devices
will typically be so large that it will be highly impractical to
search for data during the physical search of the premises.  A
single megabyte of storage space is the equivalent of 500

double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.  Storage devices capable of storing 500 or more gigabytes are now commonplace.  Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling.  Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

        d.   Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet.[5] Electronic files saved to a hard drive can be stored for years with little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten.  In addition, a computer's operating

---

[5] These statements do not generally apply to data stored in volatile memory such as random-access memory, or "RAM," which data is, generally speaking, deleted once a device is turned off.

system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment. Recovery also can require substantial time.

    e.  Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole. Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or

24

of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

        f.    Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data on a digital device is not segregable from the digital device.

Analysis of the digital device as a whole to demonstrate the
absence of particular data requires specialized tools and a
controlled laboratory environment, and can require substantial
time.

g.   Digital device users can attempt to conceal data
within digital devices through a number of methods, including
the use of innocuous or misleading filenames and extensions.
For example, files with the extension ".jpg" often are image
files; however, a user can easily change the extension to ".txt"
to conceal the image and make it appear that the file contains
text.  Digital device users can also attempt to conceal data by
using encryption, which means that a password or device, such as
a "dongle" or "keycard," is necessary to decrypt the data into
readable form.  In addition, digital device users can conceal
data within another seemingly unrelated and innocuous file in a
process called "steganography."  For example, by using
steganography a digital device user can conceal text in an image
file that cannot be viewed when the image file is opened.
Digital devices may also contain "booby traps" that destroy or
alter data if certain procedures are not scrupulously followed.
A substantial amount of time is necessary to extract and sort
through data that is concealed, encrypted, or subject to booby
traps, to determine whether it is evidence, contraband or
instrumentalities of a crime.  In addition, decryption of
devices and data stored thereon is a constantly evolving field,
and law enforcement agencies continuously develop or acquire new

methods of decryption, even for devices or data that cannot currently be decrypted.

43.  As discussed herein, based on my training and experience, I believe that digital devices will be found during the search.

a.  I know from my training and experience and my review of publicly available materials that several hardware and software manufacturers offer their users the ability to unlock their devices through biometric features in lieu of a numeric or alphanumeric passcode or password.  These biometric features include fingerprint-recognition, face-recognition, iris-recognition, and retina-recognition.  Some devices offer a combination of these biometric features and enable the users of such devices to select which features they would like to utilize.

b.  If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints.  For example, Apple Inc. ("Apple") offers a feature on some of its phones and laptops called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device.  Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which on a cell phone is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the phone, and on a laptop is located on the right side of the "Touch Bar" located directly above the keyboard.  Fingerprint-

recognition features are increasingly common on modern digital
devices.  For example, for Apple products, all iPhone 5S to
iPhone 8 models, as well as iPads (5th generation or later),
iPad Pro, iPad Air 2, and iPad mini 3 or later, and MacBook Pro
laptops with the Touch Bar are all equipped with Touch ID.
Motorola, HTC, LG, and Samsung, among other companies, also
produce phones with fingerprint sensors to enable biometric
unlock by fingerprint.  The fingerprint sensors for these
companies have different names but operate similarly to Touch
ID.

       c.   If a device is equipped with a facial-recognition
feature, a user may enable the ability to unlock the device
through his or her face.  To activate the facial-recognition
feature, a user must hold the device in front of his or her
face.  The device's camera analyzes and records data based on
the user's facial characteristics.  The device is then
automatically unlocked if the camera detects a face with
characteristics that match those of the registered face.  No
physical contact by the user with the digital device is
necessary for the unlock, but eye contact with the camera is
often essential to the proper functioning of these facial-
recognition features; thus, a user must have his or her eyes
open during the biometric scan (unless the user previously
disabled this requirement).  Several companies produce digital
devices equipped with a facial-recognition-unlock feature, and
all work in a similar manner with different degrees of
sophistication, e.g., Samsung's Galaxy S8 (released Spring

2017) and Note8 (released Fall 2017), Apple's iPhone X (released
Fall 2017).  Apple calls its facial-recognition unlock feature
"Face ID."  The scan and unlock process for Face ID is almost
instantaneous, occurring in approximately one second.

        d.   While not as prolific on digital devices as
fingerprint- and facial-recognition features, both iris- and
retina-scanning features exist for securing devices/data.  The
human iris, like a fingerprint, contains complex patterns that
are unique and stable.  Iris-recognition technology uses
mathematical pattern-recognition techniques to map the iris
using infrared light.  Similarly, retina scanning casts infrared
light into a person's eye to map the unique variations of a
person's retinal blood vessels.  A user can register one or both
eyes to be used to unlock a device with these features.  To
activate the feature, the user holds the device in front of his
or her face while the device directs an infrared light toward
the user's face and activates an infrared-sensitive camera to
record data from the person's eyes.  The device is then unlocked
if the camera detects the registered eye.  Both the Samsung
Galaxy S8 and Note 8 (discussed above) have iris-recognition
features.  In addition, Microsoft has a product called "Windows
Hello" that provides users with a suite of biometric features
including fingerprint-, facial-, and iris-unlock features.
Windows Hello has both a software and hardware component, and
multiple companies manufacture compatible hardware, e.g.,
attachable infrared cameras or fingerprint sensors, to enable
the Windows Hello features on older devices.

44.   In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than entering a numeric or alphanumeric passcode or password.  Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents.

45.   I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features have been enabled.  This can occur when a device has been restarted or inactive, or has not been unlocked for a certain period of time.  For example, with Apple's biometric unlock features, these circumstances include when: (1) more than 48 hours has passed since the last time the device was unlocked; (2) the device has not been unlocked via Touch ID or Face ID in eight hours and the passcode or password has not been entered in the last six days; (3) the device has been turned off or restarted; (4) the device has received a remote lock command; (5) five unsuccessful attempts to unlock the device via Touch ID or Face ID are made; or (6) the user has activated "SOS" mode by rapidly clicking the right side button five times or pressing and holding both the side button and either volume button.  Biometric features from other brands carry similar restrictions.  Thus, in the event law enforcement personnel encounter a locked device equipped with biometric

features, the opportunity to unlock the device through a
biometric feature may exist for only a short time.   I do not
know the passcodes of the devices likely to be found during the
search.

46.   In my training and experience, the person who is in
possession of a device or has the device among his or her
belongings at the time the device is found is likely a user of
the device.   However, in my training and experience, that person
may not be the only user of the device whose physical
characteristics are among those that will unlock the device via
biometric features (such as with Touch ID devices, which can be
registered with up to five fingerprints), and it is also
possible that the person in whose possession the device is found
is not actually a user of that device at all.   Furthermore, in
my training and experience, I know that in some cases it may not
be possible to know with certainty who is the user of a given
device, such as if the device is found in a common area of a
premises without any identifying information on the exterior of
the device.   Thus, it will likely be necessary for law
enforcement to have the ability to require any individual who is
found at the SUBJECT PREMISES or SUBJECT CAR and reasonably
believed by law enforcement to be a user of the device to unlock
the device using biometric features in the same manner as
discussed in the following paragraph.

47.   For these reasons, if while executing the warrant, law
enforcement personnel encounter a digital device that may be
unlocked using one of the aforementioned biometric features, the

warrant I am applying for would permit law enforcement personnel
to, with respect to every person who is located at the SUBJECT
PREMISES and the SUBJECT CAR during the execution of the search
and who is reasonably believed by law enforcement to be a user
of a biometric sensor-enabled device that is (a) located at the
SUBJECT PREMISES or the SUBJECT CAR and (b) falls within the
scope of the warrant: (1) compel the use of the person's thumb-
and/or fingerprints on the device(s); and (2) hold the
device(s) in front of the face of the person with his or her
eyes open to activate the facial-, iris-, and/or retina-
recognition feature.  With respect to fingerprint sensor-enabled
devices, although I do not know which of the fingers are
authorized to access any given device, I know based on my
training and experience that it is common for people to use one
of their thumbs or index fingers for fingerprint sensors; and,
in any event, all that would result from successive failed
attempts is the requirement to use the authorized passcode or
password.

48.    Other than what has been described herein, to my
knowledge, the United States has not attempted to obtain this
data by other means.

### VII. REQUEST FOR AFTER-HOURS SERVICE

49.    Federal Rule of Criminal Procedure 41(e)(2)(a)(ii),
Title 21, United States Code, Section 879, and Gooding v. United
States, 416 U.S. 430 (1974), allow a magistrate to authorize
after-hours service for "good cause."  Based on my training and
experience, my review of this investigation, my consultation

with other law enforcement agents, my prior experience serving search and arrest warrants in narcotics cases, I believe that good cause for after-hours service exists for the following reasons:

a.    Based on the drug and firearms transactions detailed in this affidavit and statements by SIU, I believe drug activity is ongoing at the SUBJECT PREMISES and the SUBJECT CAR. From my training and experience, I know that individuals who traffic in significant drug quantities (generally ounce quantities and higher) often resort to violence to protect themselves, their drugs, and drug proceeds, which they consider to be high-value items.  Based on statements by SIU, as detailed above, I am aware that SIU could obtain and/or has access to a fully automatic rifle.  Accordingly, based on my training and experience, I know that executing the search warrant of the SUBJECT PREMISES and the SUBJECT CAR (if occupied) will place law enforcement officers' safety at risk.

b.    Furthermore, maintaining the element of surprise by executing this warrant after hours will enable the entry teams to more swiftly secure the SUBJECT PREMISES and will minimize the safety risks to law enforcement agents executing the warrant, neighbors, and the public.

c.    For the above reasons, I believe that there is reasonable suspicion and good cause to conclude that requiring law enforcement agents to execute this warrant during standard hours would inhibit the effectiveness of investigation and pose an unnecessary safety risk to themselves and the public.

Consequently, I request after-hours service so that agents may execute this search warrant at any time in the day or night, whenever agents determine is most appropriate for the safety of the executing law enforcement officers and the public.

### VIII. CONCLUSION

50. For all the reasons described above, there is probable cause to believe that SAM LOCK SIU has committed a violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(C) (Possession with Intent to Distribute and Distribution of Methamphetamine).

51. Furthermore, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses, will be found at the SUBJECT PREMISES and in the SUBJECT CAR, as described in Attachments A-1 and A-2, respectively.

John E. Hackman,
Task Force Officer
Bureau of Alcohol, Tobacco,
Firearms, and Explosives

Subscribed to and sworn before me
this 26th day of February 2018.

HONORABLE JACQUELINE CHOOLJIAN
UNITED STATES MAGISTRATE JUDGE